**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF MISSOURI**
**EASTERN DIVISION**

UNITED STATES OF AMERICA,     )
                            )
    **Plaintiff,**          )
                            )
    **v.**                 ) No. 4:15-CR-00049-DDN
                            )
                            )
RAMIZ ZIJAD HODZIC, ET AL.,   )
                            )
    **Defendants.**        )

**STATUS HEARING**

**BEFORE THE HONORABLE DAVID D. NOCE**
**UNITED STATES MAGISTRATE JUDGE**

**FEBRUARY 6, 2018**

APPEARANCES:

For Plaintiff:     Matthew Drake, Esq.
                    Joshua D. Champagne, Esq.
                    Kenneth R. Tihen, Esq.
                    OFFICE OF THE U.S. ATTORNEY
                    111 South 10th Street, 20th Floor
                    St. Louis, MO 63102

For Defendant      Diane L. Dragan, Esq.
Ramiz Zijad Hodzic: Kevin Curran, Esq.
                    OFFICE OF FEDERAL PUBLIC DEFENDER
                    1010 Market Street, Suite 200
                    St. Louis, MO 63101

Recorded By:       K. Stamm

Transcribed By:    REAGAN A. FIORINO, RMR, CRR, CSR, CCR
                    Official Court Reporter
                    United States District Court
                    111 South 10th Street
                    St. Louis, MO 63102 | (314)244-7989

PROCEEDINGS RECORDED BY ELECTRONIC SOUND RECORDING
TRANSCRIPT PRODUCED BY COMPUTER-AIDED TRANSCRIPTION

```
 1   APPEARANCES CONTINUED:

 2   For Defendant          Kim C. Freter, Esq.
     Sedina Unkic Hodzic:LAW OFFICE OF KIM C. FRETER
 3                          225 South Meramec, Suite 1100
                            St. Louis, MO 63105
 4
     For Defendant          JoAnn Trog, Esq.
 5   Nihad Rosic:           MENEES AND WHITNEY
                            121 W. Adams
 6                          Kirkwood, MO 63122

 7   For Defendant          Charles D. Swift, Esq.
     Armin Harcevic:        CONSTITUTIONAL LAW CENTER FOR MUSLIMS
 8                              IN AMERICA, INC.
                            833 E. Arapaho Road, Suite 102
 9                          Richardson, TX 75081

10   For Defendant          J. Christian Goeke, Esq.
     Jasminka Ramic:        LAW OFFICES OF J. CHRISTIAN GOEKE, P.C.
11                          7711 Bonhomme Ave., Suite 850
                            St. Louis, MO 63105
12
     Also Present:          Paul J. D'Agrosa, Esq.
13

14                              *   *   *

15

16

17

18

19

20

21

22

23

24

25
```

1                          <u>FEBRUARY 6, 2018</u>

2            (The proceedings commenced at 10:16 a.m.)

3            **THE COURT:**  Good morning, everybody.

4            All right.  In the case of the United States versus

5     Ramiz Hodzic, Sedina Hodzic, Nidah Rosic, Mediha Salkicevic

6     and Armin Harcevic, Case No. 4:15-CR-49, the matter is before

7     this Court this morning for a status conference and I expect

8     and hope a scheduling conference.

9            Let's see.  On behalf of the Government, Mr. Tihen

10    is here and Mr. Drake is here and Mr. Champagne is here.

11           All right.  And on behalf of Ramiz Hodzic, let's

12    see, Ms. Dragan, she's here.  And on behalf of Sedina Unkic

13    Hodzic, Mr. D'Agrosa is here momentarily.

14           **MR. D'AGROSA:**  I'm here, Your Honor.  Thank you.

15           **THE COURT:**  And, let's see, for Nihad Rosic, JoAnn

16    Trog.  And Mediha Medy Salkicevic -- well, Mr. Goeke is here.

17           **MR. GOEKE:**  Yes, Your Honor.

18           **THE COURT:**  Do we have Ms. Gambino by phone?

19           **THE CLERK:**  We tried but she did not answer.

20           **THE COURT:**  All right.

21           **THE CLERK:**  A message was left.

22           **THE COURT:**  Okay.  Thank you.

23           And for Armin Harcevic, Mr. Swift.

24           **MR. SWIFT:**  Yes, Your Honor.

25           **THE COURT:**  Pleased to have you in St. Louis.

4

1     **MR. SWIFT:**  It is good to be back, Your Honor.  A

2  little cold today.

3     **THE COURT:**  It is.

4     All right.  And even though this was noted to be a

5  counsel-only conference, you know, the defendants -- I don't

6  know.  Are any of the defendants personally available?

7     Oh, and that is Sedina Hodzic is here.

8     **MR. D'AGROSA:**  Yes, she is here, Your Honor, for the

9  record.

10     **THE COURT:**  All right.  Thank you very much.

11     All right.  The first thing I do want to take up is

12  Mr. D'Agrosa's motion for leave to withdraw and for the

13  appointment of replacement counsel.  And just right off the

14  bat, I do understand Ms. Freter is here.  Where is she?

15     **MS. FRETER:**  Yes, Judge.

16     **THE COURT:**  All right.  Do you want to come up,

17  please.

18     I have given a lot of thought to this and, of

19  course, there is really no alternative to granting the motion

20  to allow Mr. D'Agrosa to withdraw.  And I will appoint

21  attorney Kim C. Freter to represent Sedina Unkic Hodzic in

22  Mr. D'Agrosa's absence.  So, you know, so you are now

23  appointed and there will be a documentary order to follow.

24     Mr. D'Agrosa, you are granted leave to withdraw.

25     The order that will be filed will have some language

1    in it just to be sure that the -- everyone knows what the

2    Court's position is with respect to the rules of professional

3    responsibility.  No belief that there would be any problem in

4    that respect, but I think it's fair to make it stated, you

5    know, not only for everyone's benefit but for the Court's

6    benefit as well.

7            Going with the U.S. Attorney's Office, there will be

8    some constraints about your involvement, of course, with the

9    interchange, exchange of information within that office, and

10   I'm confident that there will be no problem in that respect.

11           And as I had previously appointed second counsel

12   also to represent this defendant, I would do the same.  And

13   when we are finished this morning, Ms. Freter, if you would

14   just wait a bit and I'll counsel with you about that.

15           **MS. FRETER:**  Thank you, Your Honor.

16           **THE COURT:**  All right.

17           **MR. D'AGROSA:**  Judge, I just want to state for the

18   record that I'm, of course, aware of the ethical obligations.

19           **THE COURT:**  Sure.

20           **MR. D'AGROSA:**  So prior to today I had informed all

21   counsel in the matter, including Government counsel, of the

22   move I was making.  And of course I informed my client and we

23   spoke.  And I was anticipating a new counsel being appointed

24   and Ms. Freter as well; so I discussed the matter with her.  I

25   was a little presumptuous that perhaps you would appoint her,

6

1    so we had talked, and I hope there will be -- I'm sure there

2    will be a smooth transition.

3              **THE COURT:**  All right.

4              **MR. D'AGROSA:**  Thank you.

5              **THE COURT:**  Good.  Thank you very much.

6              All right.  The next matter really is the scheduling

7    of the hearing that counsel for the defendants have asked for

8    and actually the joint motion for hearing to determine the

9    viability of an affirmative defense in this case, docket

10   No. 415.

11             Let me ask, there's -- you know, counsel for the

12   Government, Mr. Drake, I didn't see a response to that motion

13   filed by the Government.  What is your, you know, your

14   position on that motion?

15             **MR. DRAKE:**  Sure.  Thank you, Judge.

16             I anticipated -- we didn't file a response because I

17   anticipated we would be discussing that matter here today or

18   at some status conference hearing.

19             The Government's position is as follows, Judge:  The

20   Government does not believe a factually based evidentiary

21   hearing is necessary.  We believe that the matter is fully

22   briefed before the Court.  And consistent with other

23   decisions, such as the *Ahmed* case in the Eighth Circuit out of

24   Minneapolis, Minnesota, we believe the Court is fully capable

25   of deciding the issue based on the briefings of the parties.

1          I understand or I believe -- and defense counsel can

2    speak for themselves obviously -- that the defense does not

3    agree with the Government on that subject.

4          At the absolute most, the Government believes that

5    there may be a need for a motions hearing or a hearing on the

6    status of the law.  As is evident from the briefings that the

7    parties have filed, the defense and the Government disagree

8    about which law is applicable in this case.  I don't think

9    that we can really move forward on any factually based hearing

10   when the status of the law is unsettled.

11         By way of example, Judge, the Government believes

12   that, as is evident from the briefing, the Geneva Conventions

13   apply and that that is the controlling law.  That is the law

14   that's applied by every district court that the Government is

15   aware of whenever this defense has been raised.

16         The defendants believe -- and I'm not going to speak

17   for their characterization of the law, but in a different set

18   of laws, that the laws of belligerency and Civil War-era

19   conflict and the Neutrality Act.  If that is the law that the

20   Court adopts, then we would need to know what that law is in

21   order to know what the elements of the affirmative defense are

22   to know what type of evidence might need to be proffered.

23         For instance, since it's the defendants' burden on

24   this affirmative defense, we would need to know what choice of

25   law the Court would make.  The Government is of the opinion

1  that if the Court were to look at the briefs and make a

2  decision about which law applies, that should the Court agree

3  with the Government, there would be no need for an evidentiary

4  hearing, because as a matter of course, the parties are in

5  agreement that the characterization of the conflict in Syria

6  is a non-international armed conflict, we need to go no

7  further.  That would be consistent with the *Ahmed* decision in

8  Minneapolis, consistent with this circuit and consistent with

9  every other court that's examined it.

10          However, if the defendants' characterization of the

11  law applies, then we might see a different result in terms of

12  what evidence would need to be presented.

13          So the long answer to your question, Judge, is we

14  believe that at most a status conference hearing on the status

15  of the law would be necessary.  And once that decision has

16  been made, we may or may not need a factually based

17  evidentiary hearing.

18          **THE COURT:**  All right.  I did go back and listen to

19  the presentation that was made back on May 30, 2017, when this

20  matter was first brought to the Court's attention.  And the

21  point I think that you are making, as far as whether or not

22  evidence would be appropriate, really wasn't discussed.  I

23  thought perhaps it was.  But I didn't -- because I had in mind

24  that this was an issue.

25          All right.  Thank you very much.

1          Mr. Swift, do you have a reply, I suppose.

2          **MR. SWIFT:**  I do.  I do, a bit of one.

3          We believe -- I agree with one thing on the

4    Government.  There are significant legal questions that

5    precede this.  To put them in context, however, factual

6    questions have to be determined by the Court.  The Court may

7    be able to take notice of it, but there are factual questions

8    that underlie it.

9          The question presented to the Court is one that is

10   rather unique and no precedent thorough -- completely over

11   laws in what I would call the post-911 cases.  In the post-911

12   cases, they dealt with conflicts where the U.S. was a party.

13   And that's important because they raise, primarily within the

14   Geneva Conventions, international conflicts because if the

15   U.S. is a party in a foreign conflict, it's an international

16   one.

17         Our position is not that Geneva is irrelevant, but

18   that Geneva does not cover this particular part from where a

19   U.S. Court is concerned.  This is a civil war being conducted

20   in a country wherein we were not actively involved in the

21   combat, at least during the time in question.  There are

22   periods of time in this conflict where things change, but

23   during this period of time we believe that the evidence would

24   show that this was a period of time where the United States

25   was not actively involved in conflict.

1          Under that, as we've set out in our briefing, sets

2     the Court to a different set of analysis to determine whether

3     under U.S. law combatant immunity would nevertheless exist.

4     The United States -- and we have set out, again, for the

5     status hearing, and I don't mean to argue our motion yet at

6     this time, sets out a period of -- sets out the criteria

7     wherein we would recognize the existence of a war and the

8     potential for combatant immunity.

9          It's the defenses' position that not all civil wars

10    would have combatant immunity.  Not all combatants in a civil

11    war would have combatant immunity.  You would, nevertheless,

12    under the laws of belligerency, of which the Geneva

13    Conventions are only one, if you go back to the Hague and all

14    the standing international law that might apply and the law

15    that has been applied in the United States, because this is

16    quintessentially a U.S. crime.  It is not -- we are not -- the

17    Government has not charged a war crime, per se, under the war

18    crime statute.  They are instead, which is a great breach of

19    the Genevas, these are U.S. crimes.  And whether that would

20    apply in this context under U.S. law is a determination for

21    the Court, but it does need factual information to apply that.

22         To give an example, back from the Civil War, not all

23    belligerents on the southern side enjoined combatant immunity.

24    Raiders and others who were not engaged in the normal

25    conflict, you know, what one would think of as a conventional

1   war between the two sides, did not enjoy it.  This state was a

2   (indiscernible) to because it's most famously from Missouri.

3   And many of the Missouri combatants were not afforded

4   combatant immunity during that period of time because of the

5   manner in which they (indiscernible) the combatancy.

6        And so that's a -- we said to you a factual question

7   that you will need to understand on the part of, okay, what is

8   the type of combatancy going on here because inside a civil

9   war, where a combatant immunity is presumptuously in place, in

10  an international armed conflict between the two forces of the

11  sides, it flips -- it's the defenses' position that it does

12  flip.  It places a greater burden in a civil war to show that

13  it meets the general characteristic under the state -- the

14  tests that were put out by the United States Supreme Court and

15  have never been reversed.

16        So there is a factual predicate.  And we believe

17  that a factual hearing is necessary for that part on it.  In

18  part.  So we believe that they can be combined; that it is

19  not -- it's in the interest of judicial economy to combine and

20  have the factual hearing to the extent necessary on that part;

21  and then also the legal arguments on how those facts apply

22  inside the conflict.

23        We do find that there is one area in our brief which

24  came late in the briefing but I think is extremely important

25  to the Court, and that's the neutrality doctrine, which might

1    preclude, although I think it still requires factual findings

2    by the Court, that there was, in fact, a civil war recognized

3    by the United States at the time of the combatancy and that

4    the conspiracy here involved at least one of the combatants in

5    it, was involved in that civil war as recognized by the United

6    States.  Because the neutrality doctrine, you know, as set out

7    by Justice Marshall, and I have found no case reversing it,

8    sets out that part.

9            So there might be a part --

10           **THE COURT:**  Let me ask you.

11           **MR. SWIFT:**  -- where there's no hearing required at

12   all on the facts.

13           **THE COURT:**  Just one second.  Let me ask you:  Do

14   you agree with Mr. Drake that if I were to make a choice of

15   law determination that there is a possibility that no

16   evidentiary presentation would be necessary, depending on the

17   choice of law, I just --

18           **MR. SWIFT:**  I think --

19           **THE COURT:**  I just want to just get your

20   understanding.

21           **MR. SWIFT:**  There is a potential that, yes, you

22   could do that in a part; you could make a finding that the

23   United States simply no longer recognizes combatant immunity

24   in a civil war.

25           **THE COURT:**  Okay.  Okay.

1    **MR. SWIFT:**  Despite the precedent to the contrary.

2    **THE COURT:**  Okay.  The other --

3    **MR. SWIFT:**  Or you could --

4    **THE COURT:**  -- question I have now.

5    **MR. SWIFT:**  Yes.

6    **THE COURT:**  I want you to tell me, is it possible

7    that an evidentiary presentation can be made by proffer?  Are

8    there disputes among the parties about the facts that may have

9    occurred in -- in the battlefields of Eastern Europe and

10   Europe.

11   **MR. SWIFT:**  To that I don't know the answer.  And

12   the reason I don't know the answer is that really the only

13   party that's proffered facts are the defense.

14   **THE COURT:**  Okay.  Well --

15   **MR. SWIFT:**  The Government in its motions has not

16   proffered, to my view, an alternative set of facts.

17   **THE COURT:**  Okay.  I will require counsel to confer

18   as to whether or not there is a factual dispute on facts that

19   the parties would place in evidence at any hearing.

20   That being said, there was a reference at one time

21   in these proceedings about an expert witness.

22   **MR. SWIFT:**  Yes.

23   **THE COURT:**  Okay.  And how many experts I suppose?

24   Just one?

25   **MR. SWIFT:**  We have one.

1          **THE COURT:**  And how long would that person testify?

2          **MR. SWIFT:**  I would anticipate that his direct

3     testimony would be between one and a half and two hours.

4          **THE COURT:**  Okay.

5          **MR. SWIFT:**  Based on the length of his report.  It

6     was proffered with this part, but he has done substantial

7     investigation into -- similar to the type of investigation

8     he's done for the CIA and others in an academic world --

9          **THE COURT:**  Okay.

10          **MR. SWIFT:**  -- on these types of conflicts.

11          **THE COURT:**  Okay.  Well, let's assume that the

12    parties cannot agree on the accuracy of any proffer of factual

13    material which, I just want to be clear, I do not expect from

14    counsel.  I would expect that there would be substantial

15    agreement about what historical facts were.  And that even

16    opposing positions on evidentiary facts can be made by a

17    proffer.  That is my strong thinking on the matter.

18          So, you know, the parties have had nearly a year now

19    to be preparing for this presentation.  And one issue had

20    to -- that we talked about at one time was discovery of

21    information, perhaps witnesses outside the United States.

22          **MR. SWIFT:**  We have located those witnesses.  Now --

23          **THE COURT:**  Okay.  Have you deposed them?

24          **MR. SWIFT:**  No.  The expert interviewed these

25    witnesses, Your Honor.  I have not yet sought a deposition.

1    And regardless of how this hearing goes out, we will be

2    seeking depositions of those witnesses because the Government

3    has conceded -- at least where Mr. Harcevic is concerned, as I

4    understand it from them, that if Mr. Harcevic's support went

5    purely to humanitarian aid, in other words buying of food,

6    vegetables, that sort of thing, that would not constitute

7    murder or the support of murder, and that it had to go to

8    combatancy.

9            And both of these witnesses, along with testifying

10   with how they thought and where they thought Mr. Pazara was

11   located, also testified to humanitarian efforts that he made

12   on the biopic pictures.  So regardless of whether a combatant

13   immunity defense were accepted, there's the alternative, at

14   least as far as my client goes, I don't want to speak for

15   anyone else, that these witnesses would also be relevant to

16   whether --

17           **THE COURT:**  Okay.  Let me ask you.

18           **MR. SWIFT:**  Yes.  So I'm going to seek a deposition

19   for them, but I was waiting for this part before it.

20           **THE COURT:**  I'm confident I have -- I would go back

21   and listen to all of the status conferences that I probably

22   stated that I would have approved any deposition proceeding at

23   any time to -- and I even -- I have a recollection of

24   mentioning even making a witness available by Skype into the

25   courtroom.

1          **MR. SWIFT:**  Right.

2          **THE COURT:**  Well, how much time -- let's assume -- I

3     mean, I would grant the defendants leave to pursue the

4     deposition process, but I'm a little surprised that hasn't

5     been done before now.  But that being said, how much more time

6     would be necessary to achieve that discovery in that fashion?

7          **MR. SWIFT:**  And the depositions, I would presume

8     that they would be -- I -- the depositions themselves would

9     take a day.  Making the logistics in Bosnia, I'm not prepared

10    to answer immediately, Your Honor.  We've had two different

11    interviews with them.  We've sent an investigator and then the

12    expert.  So we have located them.  I don't know that it would

13    be difficult or not.  It's more getting through the procedural

14    hurdles.

15         Both have indicated that they are willing to sit for

16    a deposition; they are willing to talk; they are willing to do

17    all of those things and we have the information for it.  So I

18    would have to leave the -- you know, this is -- the other

19    hurdle of depositions are, of course, going through the

20    government of Bosnia.  That's the next part, letters rogatory

21    to have the depositions potentially on that part.  And I would

22    want to go through the government in this case.

23         So letters rogatory might take some period of time,

24    but --

25         **THE COURT:**  Could --

1      **MR. SWIFT:**  Yes.

2      **THE COURT:**  Do we have to be -- go through that

3    formality if -- if someone would appear via a digital

4    communication system and the person was verifiably identified?

5      **MR. SWIFT:**  You know, Your Honor, I am always

6    hesitant because I don't know the politic -- I haven't asked

7    the politics on the land.  I would agree with you legally, as

8    far as this Court's concerned, it is not required.  I am

9    always a little hesitant -- or always, not a little hesitant

10   to go into a foreign country and proceed with a legal event

11   where that had not been cleared with the local authorities to

12   permit that.

13          My understanding from both the witnesses is that

14   they would voluntarily appear for those, but I don't want to

15   speak and guarantee you that that could happen when neither

16   the Government nor I have spoken to the Bosnian government

17   about it.

18          And I give just one example of where I think counsel

19   can make a big mistake.  I'm involved in the habeas part on

20   it, which was the *Khan* case in Florida where they set up

21   exactly that arrangement -- digital links in Pakistan during

22   the course of the trial or a hearing that after the first

23   witness was shut down by the government of Pakistan because

24   they had not agreed.  And I don't want to place myself in that

25   same position, because we are speaking about a second-party

1  government and I am under no illusions that these persons will

2  get visas from the United States to come to the United States.

3  That's not going to happen.

4         Nevertheless, I do think that they are important.

5  Now, they have --

6         **THE COURT:**  Would they be willing to travel to the

7  United States?

8         **MR. SWIFT:**  They would be willing to travel to the

9  United States, but they are not going to gain -- because of

10  their -- because they were participants in the Syrian

11  conflict, I think that it would be illusory to say that they

12  would be permitted to travel to the United States from Bosnia

13  under the current travel restrictions.  And I have never had a

14  witness who was a participant gain such access.

15         **THE COURT:**  Okay.

16         **MR. SWIFT:**  So, you know, in the course of this, my

17  feeling is that we could certainly potentially -- I've done

18  these electronically for the Court.  I've done them with the

19  United States at the U.S. embassy or at a hotel where we just

20  videotaped the deposition and had the Court available for

21  objections and just maintained the objections, did that

22  version in Sadiki (phonetic) in Afghanistan.

23         Now, in Afghanistan I wasn't -- neither party were

24  worried about the government because we had a very close

25  alliance.  And then I have done them, you know, via letter

1    rogatory in another case wherein we -- in Pakistan -- again,

2    having learned from the *Khan* case to make sure that the

3    government of Pakistan was okay.

4              **THE COURT:**  Okay.  Thank you very much.

5              Mr. Drake, do you have a response to what Mr. Swift

6    has said?

7              **MR. DRAKE:**  Yes, briefly.  And more for some of the

8    questions that the Court had.

9              I think the Government is confident -- the Court

10   asked about a proffer of facts.  I think the Government is

11   confident that the parties, defense and the Government, could

12   come to some understanding and make some stipulations of fact

13   for the Court in general terms.  In other words, I don't -- we

14   don't have a substantial disagreement among all of the

15   parties, the Government included, about the facts of what's

16   going on here.  And I think we could make some submission to

17   the Court, some proffer of facts to aid the Court in its

18   decision about the choice of law and things like that.

19             The Government's position is quite simply that this

20   is an affirmative defense.  Every other court that's ever

21   heard this type of affirmative defense has decided on one set

22   of laws, the set that the Government is arguing.  And most

23   courts have been able to resolve that issue without a

24   factually based evidentiary hearing once you have some facts

25   before the Court to make -- to form the basis for your

1   decision.

2            For instance, if -- I think we are all in

3   agreement --

4            **THE COURT:**  I do understand what you are saying.

5            **MR. DRAKE:**  Secondly, as far as the witnesses are

6   concerned that Mr. Swift is talking about, we also don't have

7   a problem with that.  I don't know that that should hold up

8   moving forward on the combatant immunity issue.  I think what

9   Mr. Swift's witnesses would be speaking to are trial defenses,

10  trial issues.  In other words, those witnesses are not going

11  to speak to the type of conflict that was going on in Syria or

12  whether or not this was an armed international conflict or a

13  non-international conflict.

14           So I don't think that -- and Mr. Swift can correct

15  me if I'm wrong, obviously he will, but I don't think that

16  they will substantially change the playing field for issues

17  that the Court would need to decide for this affirmative

18  defense.

19           **THE COURT:**  Okay.  Let me ask that -- I'm losing my

20  train of thought a little bit.

21           How much time would the parties need -- and my

22  interest is in advancing this matter.  Well, there is a legal

23  issue that I would like the parties to at least have in mind.

24  If the defendants proffer a substantial basis, whether a *prima*

25  *facie* showing of evidence of the establishment of the

1    affirmative defense, does that or does that not put the burden

2    on the Government as with respect to some other affirmative

3    defenses to disprove that affirmative defense beyond a

4    reasonable doubt?

5              **MR. DRAKE:**  I think -- yes, if I understand your

6    question correctly, Judge.  If the defense makes a *prima facie*

7    showing that --

8              **THE COURT:**  And we are speaking about in terms of

9    what a trial jury would be instructed on.  I'm not -- but

10   I'm -- just for the context.

11             Now, that harkens back to the discussion, perhaps,

12   in May, on May 30, 2017, when the parties, I think, agreed

13   that the outcome of the presentations on the affirmative

14   defense procedure would advance the disposition of the case.

15   And, in fact, I voir dired under oath each of the defendants

16   at that time and they all agreed to this procedure as sort of

17   a shortcut to getting to a position of disposition.

18             And so, you know, there's a lot of value to be

19   accomplished by this.  And one thing I don't want to do, and I

20   think the parties even at the Rule 104 hearing and, you know,

21   if I were to make a determination as to what evidence is not

22   relevant, whether or not -- if I were to make a choice of law

23   that would eliminate at least at that stage the relevance of

24   some evidence, the parties would be entitled to make a showing

25   of proof, a proffer, of what that evidence would be so that a

1   reviewing court or judge could make a determination as to

2   whether or not the procedure at this level was appropriate.

3           So I'm -- even if I were to ultimately make a

4   determination as to what the choice of law was, I want to be

5   fully informed about what the evidence would be on both sides.

6   That said, I think that the parties can proceed.  Unless there

7   is a substantial disagreement as either to the availability of

8   evidence of a certain relevant fact or the credibility of a

9   source of information, that the parties could agree on proffer

10  of information to the Court.  And I thought that -- I was

11  looking for that in the statements on that date.  I didn't

12  find it on that date but that's what the Court had in mind

13  hopefully; that the parties could proffer statements of fact

14  with a showing of what the source of that information would be

15  and the Court could receive that.

16          And I would be -- if there was a need then or a

17  desire to put on the record more easily such as having an

18  expert testify live, along with the presentation of proffers

19  of information, that the parties -- or stipulations, actually,

20  of fact, of relevant fact, that the Court could then proceed

21  to make the determinations at this stage.

22          I know that's a lot, but I --

23          **MR. DRAKE:**  I think that we can do that, Judge,

24  either individually by simply proffering to the Court what the

25  United States' evidence would be if we were to proceed to a

1    hearing or certainly I think some sort of joint discussion

2    with the defense about -- we believe those facts could be

3    determinative, if we could agree to them, based on the Court's

4    decision on the law.

5           **THE COURT:**  Okay.  There is, you know, the

6    outstanding motion, I think, before Judge Perry on the *Frye*

7    business about -- but that's -- we are backed off of that now,

8    I believe.

9           **MR. DRAKE:**  Yes, Judge.  And in answer to your

10   earlier question or one of your earlier points, the Government

11   and the defense all met, and the Government agreed to postpone

12   seeking a superseding indictment until the conclusion of these

13   proceedings simply because there was some hope that they might

14   be determinative.  Whether or not they will, I don't know.

15   But, you're right, we did believe and do still believe that

16   this could maybe resolve matters.  But we are not certain

17   about that.

18          **THE COURT:**  Okay.  All right.  Mr. Swift.

19          **MR. SWIFT:**  Yes, Your Honor.

20          **THE COURT:**  What we have before us is the defense

21   motion --

22          **MR. SWIFT:**  Yes.

23          **THE COURT:**  -- for the hearing, the joint motion.

24          **MR. SWIFT:**  Yeah.

25          **THE COURT:**  How long do you think it would take you

1  to, on behalf of all of the defendants, to provide the Court

2  with an itemized list of the relevant facts on the -- of the

3  affirmative defense.

4          **MR. SWIFT:**  Yes, Your Honor.

5          **THE COURT:**  From the defendant's perspective with an

6  identification of the expected source of evidence to sustain

7  those statements of fact.

8          **MR. SWIFT:**  I could have that in two weeks from

9  today.

10          **THE COURT:**  Two weeks.  Okay.

11          **MR. SWIFT:**  I trust my counsel will be able to all

12  agree with what I have on that.  I'm speaking on the part, but

13  I know I can produce it and get it reviewed by that period of

14  time.

15          **THE COURT:**  Okay.  And just for the record, you

16  know, I want the record to be entirely clear, Mr. Curran and

17  Mr. Dwyer are present in the courtroom taking diligent notes.

18  I just want the record -- along with Ms. Dragan from the

19  Public Defender's Office.

20          All right.

21          **MR. SWIFT:**  And I do see, Your Honor, I would point

22  to the part -- part of the reason I'm in this case is it's

23  extraordinarily academically interesting.

24          **THE COURT:**  I entirely --

25          **MR. SWIFT:**  It is an academically fascinating case.

1          **THE COURT:**  Justice Vaughan, back in 1670, in

2     Bushel's case said that in order to find out what the law is,

3     you need to know what the facts are.  In order to find out

4     what the facts are, you really need to know what the law is.

5     So they sort of go hand in hand.

6          **MR. SWIFT:**  Yes.  And because it presents novel

7     issues, and because they are a part, I think that the Court

8     has to have -- we do need to come down to a set of either

9     agreed facts or facts to support what it found.  Because I

10    anticipate that the loser appeals.  I would expect the

11    Government, if they were to lose, to appeal in part down the

12    road.  It may resolve things.  I don't know.  But because of

13    the novelty of the issue, I agree --

14         **THE COURT:**  I understand.

15         **MR. SWIFT:**  -- with the Court that we need to have

16    the facts --

17         **THE COURT:**  I understand.

18         **MR. SWIFT:**  -- in the part of this.

19         **THE COURT:**  I understand.  But whether or not

20    there's any appeal, whether or not the parties then engage in

21    meaningful discussions is entirely for the parties to work

22    out.

23         **MR. SWIFT:**  Yes.

24         **THE COURT:**  All right.  Two weeks.

25         **MR. DRAKE:**  Judge, can I interrupt just for one

1    second.

2              **THE COURT:**  Yes.

3              **MR. DRAKE:**  Just so I'm clear.

4              The Government could also do the same thing, which

5    is proffer from the facts that it believes within the same --

6    I'm sorry -- within the same time period.  Alternatively,

7    should the defense proffer its facts within two weeks, the

8    Government could respond and either agree with those facts or

9    not.

10             What I'm trying to figure out is:  Would you like us

11   to confer about what those facts would be in advance?  Do you

12   want us to respond?  Or do you want us to proffer our own

13   separate set of facts to the Court?  How would the Court best

14   like us to proceed?

15             **THE COURT:**  Well, and I don't want to delay things.

16   And maybe the two of you can confer so that simultaneous

17   presentations can be helpful and maybe even a joint

18   presentation.

19             **MR. SWIFT:**  Well, if we are going to go to that,

20   what I would propose to that is this:  That two weeks from now

21   I will get that to the Government; that the Government be

22   given a week to indicate what they agree or disagree with and

23   any alternative facts that they would like to put into it; and

24   that we have two days after that, which would put it to the

25   end of this month, I'm thinking, if I've counted things up

1   right, for a joint submission at that point.

2         **THE COURT:**  Okay.

3         **MR. SWIFT:**  That gives us a little time to go back

4   and forth because I have a lot of cats.

5         **THE COURT:**  I'm not looking for a disposition -- for

6   presentations that would dispose of the matter.  I'm looking

7   for a set of deadlines or at least to be informed about what

8   the scheduling for this hearing would require.  I am not -- if

9   the parties are not going to disagree about a lot of the

10  historical facts, then there's not going to be a need to file

11  letters rogatory to get permission for proceedings in foreign

12  countries.

13        **MR. SWIFT:**  I understand.

14        **THE COURT:**  And, you know, I just don't see a need

15  for that unless there is some actual substantial disagreement

16  with what the facts, the relevant facts, historical facts are.

17        And I think then that the -- as I said, I think --

18  if I were to agree with the Government on what evidence is

19  relevant, then the defense would be in a position of being

20  entitled to make a proffer of -- a record of what the facts

21  would be had you been given an opportunity and vice versa.

22        So, you know, we are not going to shorten the record

23  too much by making an early determination of choice of law is,

24  I guess, one point I want to make.  But if on the same

25  elements that Mr. Swift has in mind, you would have other

1    items of evidence, then I think that that would be

2    appropriate.  But I think the defense can go first.  I'll give

3    you two weeks.  And then I think that would -- I hate to get

4    too far.  Defendants by March or by February 20, two weeks

5    from today.  And then the Government, by March 6.  That's two

6    weeks.

7            **MR. DRAKE:**  That's fine, Judge.  And I'll sit with

8    defense counsel, certainly, if they want me to, and confer and

9    we can hopefully even get it quicker.

10           **THE COURT:**  Okay.  Mr. D'Agrosa, has he withdrawn?

11   He is really withdrawn?

12           **MS. FRETER:**  He has left the building, Judge.  It's

13   my understanding that Mr. D'Agrosa has been given an ethics

14   opinion from the U.S. Attorney's Office that he's not to work

15   additionally on these cases in any manner.  So that is going

16   to hinder -- he can give me the file and he can give me the

17   very brief thumbnail, which he has done, which is mostly

18   contained in the indictment, but he is not allowed to, it's my

19   understanding, assist me in terms of when other defense

20   counsel has come up with these facts, he is not going to be

21   allowed to sit down with me and say this is right or you need

22   to add this or this is incorrect.

23           **THE COURT:**  Right.

24           **MS. FRETER:**  The other federal public defenders

25   certainly will help me.  I'm sure co-defendants' counsel will

1   help me.  But sitting here today without a file, Judge, I

2   can't promise this Court that with a two-week turnaround I'll

3   be totally up to speed by that point.

4           **THE COURT:**  I understand.

5           I have a draft order.  He's -- he would give you his

6   file, in effect, and provide you with information that he has

7   been provided with, documentary and otherwise, right away.

8   And so what you are saying is not that he has not done that or

9   doesn't intend to do that.

10          **MS. FRETER:**  No.  It's my understanding -- we spoke.

11  It's my understanding he is intending to give me the file, but

12  he is not going to be allowed to, because of this short

13  turnaround time, he's not going to be allowed to -- sometimes

14  when you take a file over from counsel, with this sort of

15  thing moving quickly, he would be allowed to sit down with me,

16  review the document and say, you know, here at point 3, this

17  is not agreeable, that he is not going to be able to engage in

18  that sort of back and forth.

19          I will have co-defendants' counsel to consult with.

20  I just wanted to, for the record, to indicate to the Court

21  that I will try my very, very best, but that I'm at somewhat

22  of a disadvantage today only having read the pleadings that

23  are available but not the entirety of the file.

24          **THE COURT:**  I understand.  And I appreciate your

25  making a record on that and I expect that within the rules of

1   professional responsibility, counsel for the Government would

2   cooperate in explaining things, you know, to help you come up

3   to speed and cocounsel for all of the defendants would do the

4   same.

5           **MS. FRETER:**  My concern is if you are talking about

6   a stipulated fact as to the date that whatever hostilities

7   first started is one thing.  My particular concern is as it

8   involves my client particularly in terms of a stipulated fact;

9   that there may be a certain fact that is more essential to her

10   or more disagreeable to just her particular case rather than

11   the sort of overarching thing.  I will have to see what gets

12   drafted first, but then if after speaking with my client we

13   are in a position where we may need to change things, I'm just

14   letting the Court know that I may file a motion to that

15   effect.

16           **THE COURT:**  Oh, I understand.  And I appreciate

17   that.  You will have what the -- you know, the other attorneys

18   for the defendants will file in two weeks, you will have that,

19   be able to confer with your client about that in the two weeks

20   that the Government is going to take.  And you can -- I would

21   expect that if there is an issue about preparation, about

22   knowledge, that you would bring it to the Court's attention.

23           **MS. FRETER:**  Thank you, Your Honor.

24           **THE COURT:**  All right.  Thank you very much.

25           All right.  Mr. Drake.

1     **MR. DRAKE:**  Yes, sir.

2          **THE COURT:**  On behalf of the Government, is there --

3     I think we've gone over the issues that I wanted to bring and

4     discuss with counsel.  Do you have any report to make on any

5     other discovery disclosure?

6          **MR. DRAKE:**  No, not substantially, Judge.  I've

7     spoken with the Public Defender's Office very briefly.  The

8     Government continues to work on verbatim translations.  I have

9     a number of those with me that I have not disseminated.  I

10    will continue to do that.  But in terms of the substantive

11    discovery, everything that the Government is aware of at this

12    time has been disclosed.  Now we are just working on the

13    (indiscernible) to English translations.

14          And just so the Court knows, and for the record, I

15    will extend the same offer to Ms. Freter as I did to every

16    other counsel, which was to sit down and go through the

17    discovery, go through what the Government has turned over.  It

18    is voluminous and we are in the process of trying to make a

19    potential index for defense counsel to that effect.  But I

20    will do the same thing to expedite matters there.

21          **THE COURT:**  All right.  I'm sure Ms. Freter would

22    take advantage of that.

23          **MS. FRETER:**  Thank you, Your Honor.

24          **THE COURT:**  Mr. Swift, is there any other item that

25    you would like to have taken up at this time?

1      **MR. SWIFT:**  No, Your Honor.  Just one note for the
2  Court's knowledge.  I will be in the United States versus
3  Salman which is the Orlando shooting trial in Orlando from the
4  1st of March -- it's a five-week trial -- until the end of
5  April.  I can easily make my filings.  I have staff.  I'm able
6  to do that.  But I wanted to let the Court know that if we
7  were to try and do something in the month of March, I'm gone.
8  But I'm back in April, Your Honor.

9           **THE COURT:**  All right.  No hearing during March.
10          **MR. SWIFT:**  Thank you, Your Honor.
11          **THE COURT:**  All right.  Ms. Dragan, do you have
12  anything to put on the record or to add to the comments today?
13          **MS. DRAGAN:**  No, Your Honor.
14          **THE COURT:**  Ms. Trog?
15          **MS. DRAGAN:**  Your Honor, can I say just one ...
16      Mr. Drake and I did speak about having an index put
17  together and part of the problem that we are having with our
18  client in the county is we have all these disks that we
19  provided and he is supposed to be getting access to them.
20  There's, I don't know, let's just say at least 50.
21      The jail is randomly choosing five to give to him
22  and they are choosing, not him, and he is only getting an hour
23  or two at a time.  So we are trying to put together an index
24  with the help of the Government, put everything on a hard
25  drive, so our client actually has access to the discovery.

1          So we just wanted the Court to be aware that we are

2    still having actual discovery issues with our client having

3    access to things and that does -- that is slowing things down

4    for us.

5          **THE COURT:**  Okay.

6          **MR. CURRAN:**  I realize it's not irrelevant.  We have

7    told him that we would make the record with you because you

8    may see a motion if we can't get something done through the

9    normal channels.

10         **THE COURT:**  All right.  Okay.  You can tell the jail

11   administration that the Court expects cooperation so that this

12   can be accomplished.

13         **MS. DRAGAN:**  Thank you.

14         **THE COURT:**  Thank you very much.  Ms. Trog.

15         **MS. TROG:**  Your Honor, I can appreciate everything

16   we've talked about.  I can appreciate Ms. Freter's position

17   just coming into a case.  But we are approaching the third

18   anniversary that three of these defendants have been confined.

19   And however quickly -- and I appreciate Mr. Swift giving you

20   his schedule so that we can get something figured out sooner

21   than later.

22         I know people will probably throw bags at me, but I

23   am concerned about speedy trial provisions.  And that's my

24   concern, Your Honor, is that if we could do this to allow each

25   side to present what it must present but -- and I know the

1    Court has this in mind as well, but three years and we have

2    nothing accomplished.

3              **THE COURT:**  Well, no, I don't think that last

4    statement is a fair statement.

5              **MS. TROG:**  Well, we had discovery -- well, no, no,

6    no.  Well, for the defendants, Your Honor, for the defendants.

7              **THE COURT:**  Well, we have had motions to dismiss

8    that were litigated.  I filed an R&R on the motions to

9    dismiss.  And we have talked a lot about things, so ...

10             **MS. TROG:**  Well, perhaps I misstated.  To our

11   defendants or to certainly to my defendant, Mr. Rosic.  And

12   he's read your rulings, Your Honor, and he's read all the

13   filings.  But he is getting a little antsy as to his day in

14   court.

15             **THE COURT:**  I understand.  All right.

16             **MS. TROG:**  Thank you.

17             **THE COURT:**  You are welcome.  All right.  Mr. Goeke.

18             **MR. GOEKE:**  I have nothing further, Your Honor.

19   Thank you.

20             **THE COURT:**  All right.  Thank you all very much.  I

21   will issue orders on counsel for Ms. Hodzic.  And I'll issue a

22   scheduling order on what the Court expects in two weeks and

23   then in four weeks.

24             All right.  Thank you all very much.

25             (The proceedings concluded at 11:06 a.m.)

<u>CERTIFICATE</u>


    I, Reagan A. Fiorino, do hereby certify that I am a duly appointed official court reporter for the United States District Court for the Eastern District of Missouri.

    I further certify the foregoing is a true and accurate transcription as heard and understood from the taped proceedings held in the above-entitled case as has been transcribed from said tape to the best of my ability.

    This reporter does not certify any transcript nor takes any responsibility for missing or damaged pages of this transcript when said transcript is copied and delivered by any party other than this reporter.




    August 26, 2019                /s/Reagan A. Fiorino

     Date             ----    Reagan A. Fiorino